FILED
CLERK
2/7/2025 3:02 pm
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

CARMEN BORLEY,

                              Plaintiff,

         -against-

UNITED STATES OF AMERICA,

                              Defendant.

------------------------------------------------------------------------X

**FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING BENCH TRIAL**

18-CV-740 (GRB)

**GARY R. BROWN, United States District Judge:**

This Federal Tort Claims Act case comes before the Court, following the Second Circuit's reversal of a grant of summary judgment in favor of the Government by Judge Hurley and remand for further proceedings. *Borley v. United States*, 22 F.4th 75, 77 (2d Cir. 2021), *vacating Borley v. United States*, No. 18-CV-740 (DRH)(AYS), 2020 WL 7974307 (E.D.N.Y. Dec. 1, 2020). Familiarity with both decisions is assumed. On January 21, 2025 the Court held a bench trial[1] limited to whether the Government had constructive notice of the allegedly dangerous condition, bifurcating the questions of damages to conserve resources for the parties. Minute Entry dated January 13, 2025. For the reasons stated herein, the Court grants judgment for defendant.

---

[1] While, in several instances, the Court of Appeals' decision references determinations to be made by a jury, *see, e.g.*, 22 F.4th at 79 ("[T]he district court should have let Borley's negligence claim reach a jury"), in an FTCA action against the United States, a plaintiff has no right to a jury trial. *Matthews v. CTI Container Transp. Int'l Inc.*, 871 F.2d 270, 279 (2d Cir. 1989) ("[U]nder the FTCA, [a plaintiff] cannot obtain a jury trial against the United States").

1

*Factual Background*

The trial offered a more complete record of the allegedly dangerous conditions, including better photographs and more descriptive testimony. The sole entryway for the commissary consisted of a single doorway containing four glass door panels. *See* Ex. AR14, 19; Tr. 3-6, 11-15, 39-40. The two center panels were automated, mechanical sliding panels that were activated via a push button, causing the center panels to retract behind the outer two panels. Tr. 41-42. The far left door (as seen from inside the store), together with the left center panel that slid behind it, functioned as an emergency door. Together, those two panels could be unlatched and swung open, thereby widening the area of egress from two to three door widths. Tr. 5, 11, 12-13. The far left panel had a metal bar in front, which was mounted approximately 6 to 8 inches off the ground, Tr. 24, the purpose of which was to stop shopping carts from hitting the doors. Tr. 30. However, that bar did not extend beyond the far left panel and therefore did not create any tripping hazard during normal operation. Tr. 25-26. It was, therefore, only when that far left panel was open that the metal bar could conceivably present an issue.

The evidence elicited at trial differed in five significant ways from the record addressed on summary judgment. First, the testimony of the manager at trial demonstrated that the door opened infrequently. Tr. 44. Usually, the door was latched closed. It could be opened either through turning a knob to release the latch, or if the door were pushed with "real force." Tr. 16. It came open, the manager estimated, less than once per week. Tr. 19, 44.

At her deposition, the manager gave the following testimony concerning the frequency of the emergency door coming open:

> Q: In an average day, when you worked at Mitchel Field, approximately how many times would you see these doors pushed open?

> A: You said average day?
>
> Q: Yes.
>
> A: They're not pushed open often, but average day, I guess maybe once because sometimes even customers push them.

Tr. 19-20. It was this bit of deposition testimony that drove the determination that the doors came open daily. 2020 WL 7974307, at *1 ("They were not pushed open often, but on an average day could be pushed opened once."). At trial, given the chance to explain this snippet, the manager clarified her deposition testimony:

> If the doors open, on average, it would only be possibly one time a day. That's what I meant by that.

Tr. 18. Upon further questioning, it became clear that the doors were not opened on a daily basis; the witness estimated that the doors came open about four times per month, and generally less than once per week. Tr. 18-19. Having had the opportunity to observe the witness's testimony, the Court found her credible and credits her explanation of the prior deposition testimony.

The only other testimony offered concerning the frequency of the emergency door being opened came from plaintiff's husband. He testified that he had visited the commissary "probably weekly for a year or two," and had shopped there for many years. Tr. 66-67. Despite those visits, he "was never aware" that the doorway at issue "was an emergency door" and had never seen "the side that exposes the bar" opened. Tr. 67. Thus, the husband's testimony tends to corroborate—albeit based on a small sample size—the manager's testimony that the emergency door was infrequently opened.

Second, trial testimony provided insight about the length of time that the emergency door remained open on the day of the accident. At summary judgment, the record was silent on how

3

long the door was open; Judge Hurley found that plaintiff simply failed to meet her burden on this point. 2020 WL 7974307, at *5 (noting that plaintiff "has admitted that neither she nor defendant were aware of how long the door was open"). At trial, however, plaintiff's husband testified that the emergency door was closed when he and plaintiff exited the store. Tr. 73. The two proceeded to his car, where they unloaded the groceries. *Id.* She left him waiting in the car, while she walked back to the entrance to return the cart. *Id.* He then learned that she had fallen from another customer and rushed back to the entrance where he observed the emergency door open for the first time. Tr. 68. Crucially, he testified that somewhere between two to three minutes elapsed between the point at which she left him to return to the store and when he learned of her accident, leading him to rush back to the scene. Tr. 68-73. Thus, the evidence suggests that the emergency door was open for a period of two minutes or less before the accident.

Third, the amount of force needed to open the latched emergency door also developed differently during the trial testimony. The assertion that the emergency door was easily opened came from this excerpt from the manager's deposition:

> Q: Would there be any reason for these doors to be pushed open at all?
>
> A: Well, another customer could have pushed -- push it open. You can easily push it open with your shopping cart as well. No employees would have opened that door.

Tr. 52. Notably, counsel seized on the word "easily" in this response, which was given in reply to a question about something other than the amount of force required to open the door. However, during her deposition, the manager provided further testimony on this question:

> Q: And with regard to the doors, and you said they can be pushed open, if you can recall how heavy were the doors?
>
> A: I don't know the weight.

4

> Q: Okay. Could it be pushed open with the touch of a hand?
>
> A: It's not that easy to push.

Tr. 55.  At trial, when asked directly about the force required to open the door, the manager – credibly in this Court's view – testified on direct and cross-examination and in response to a question from the Court that opening the doors was not an easy matter.  She noted that "you had to use real force" and "you can't just tap it and it opens." Tr. 16.  Instead, opening the door requires "a level of force." Tr. 40.  "You would have to … put force on the shopping cart," she emphasized a few minutes later.  Tr. 51.

Fourth, the purpose of the metal bar became apparent from the manager's trial testimony.  While at summary judgment, no evidence about the purpose of the metal bar was present, at trial, the manager offered undisputed testimony that the bar had been installed to prevent shopping carts from striking the emergency door and potentially breaking the glass.  Tr. 53.

And fifth, the Government took substantial measures to monitor the doorway.  Whenever the commissary was open, a full-time employee was assigned to check IDs for those who wished to enter the establishment.  That employee, stationed about 30 feet away from the entryway, had a clear view of it, and had been instructed to close the door should he see it opened.  Tr. 37, 50-51, 55.  Furthermore, all staff members were under similar instructions, and the manager estimated that staff members passed through those doors dozens of times per day.  Tr. 41-43.  Thus, in addition to the full-time employee checking IDs who continuously monitored the entryway, the doors were subject of ten to fifteen spot checks per day.  Tr. 43.

The commissary had relatively light foot traffic – only about 40 customers per day entered and exited the store.  Tr. 17.  No one had ever tripped over the bar or reported injury from it before.  Tr. 47.  Aside from providing more complete descriptions of the doorway and

5

defendant's efforts to monitor, trial testimony also revealed that plaintiff was unsure whether she tripped over the bar. Whereas the Court of Appeals was presented with material giving rise to the inference that plaintiff "tripped over the metal bar and injured her head," 22 F.4th at 78, at trial, plaintiff could not pinpoint the metal bar as the source of her fall. Plaintiff described circumstances leading up to the accident, noting that she had gone shopping for groceries with her husband, had brought the groceries to his car, and went alone to return the shopping cart. Tr. 59-60. At that point, while she was talking with some other shoppers, according to the plaintiff's trial testimony:

> A: . . . I just [] fell
>
> Q. What did you fall over?
>
> A. I don't know. I felt, I fell over something . . .

Tr. 60. A few minutes later, plaintiff confirmed that "[she] did not know what [she] tripped over." Tr. 65. Neither of the other two witnesses who testified, the plaintiff's husband and the store manager, witnessed the accident.

### *Discussion*

Trial testimony revealed that plaintiff was unable to establish (i) that she tripped over the bar and (ii) that defendant had constructive notice of the allegedly dangerous condition.

### *Causation*

"[A] plaintiff's inability to identify the cause of [a] fall is fatal to the cause of action because a finding that the defendant's negligence, if any, proximately caused the plaintiff's injuries would be based on speculation." *Ash v. City of New York, Trump Vill. Section 3, Inc.*, 109 A.D.3d 854, 855 (N.Y. App. Div. 2d Dep't 2013). "Where it is just as likely that some other factor, such as a misstep or a loss of balance, could have caused a slip and fall accident, any

6

determination by the trier of fact as to causation would be based upon sheer conjecture." *Mitgang v. PJ Venture HG, LLC*, 126 A.D.3d 863, 864, (N.Y. App. Div. 2d Dep't 2015) (internal quotations omitted).

At trial, plaintiff failed to prove that she tripped over the bar. While the commissary's incident report states that plaintiff tripped over the bar, that form was completed by the manager who testified that she did not witness the incident. Tr. 48. The information recorded in the incident report was reported to the manager by the plaintiff's husband, who also testified that he did not see the incident, so the reliability of the report is highly questionable. Tr. 49. Therefore, there is no competent evidence to establish that plaintiff tripped on the steel bar.

Additionally, at trial, the Government offered evidence suggesting other potential causes for the fall emanating from the plaintiff's physical condition and the physical surroundings. Only two weeks earlier, medical records from plaintiff's chiropractor reflected mobility issues including issues walking or going to work. Def. Ex. G. Photos of the scene reflect other objects—like mats and shopping carts – that could have caused the fall. Thus, I find that plaintiff failed to present competent evidence that the complained of condition caused her fall.

*Notice*

"To prove liability based on constructive notice, the danger must have been 'visible and apparent and it must exist for a sufficient length of time prior to the accident to permit the defendant to discover and remedy it.'" *Nussbaum v. Metro-N. Commuter R.R.*, 603 F. App'x 10, 12 (2d Cir. 2015) (quoting *Lemonda v. Sutton*, 268 A.D.2d 383, 384 (N.Y. App. Div. 1st Dep't 2000)). To "establish constructive notice through evidence that the defendant was aware of an ongoing and recurring unsafe condition," a plaintiff must show that "the recurring unsafe

7

condition regularly went unaddressed." *Looney v. Macy's Inc.*, 588 F. Supp. 3d 328, 347 (E.D.N.Y. 2021) (internal quotations omitted).

Plaintiff's case also fails on the question of constructive notice. Plaintiff concedes that she could not prove that defendant had actual notice of the condition, such that the sole issue for the Court – even assuming plaintiff had established causation – was constructive notice. Tr. 83-84. This question requires, as the Circuit noted, a review of particularized facts. Here, constructive notice blurs with the issue of due care and turns on facts specific to the unusual physical conditions of the doorway and the procedures adopted by the commissary to ensure customer safety.

The Second Circuit reversed the grant of summary judgment after "view[ing] all facts in this case in the light most favorable to [plaintiff and] resolving all ambiguities in her favor." 22 F.4th at 78. In light of material suggesting that "the doors would come open easily" and "would do so roughly once a day," and that staff would only "periodically check to see if the emergency doors had come open," *id.* at 77, the Circuit found that summary judgment was inappropriate, as plaintiff had "established a triable issue of fact as to whether the commissary had sufficient notice (constructive or actual) of the hazard posed by the existence of an open emergency door that had an ankle-high metal bar in front of it." *Id.* at 81. The Court of Appeals remanded the case for a trial to resolve this "highly fact-specific question." *Id.*

Following careful evaluation of the trial evidence, the facts presented are far different from those considered by the Court of Appeals. According to undisputed testimony, the emergency door did not come open daily, but rather less than once per week. It did not open upon casual impact, but required some force to open. Most importantly, upon all of the facts and circumstances, the Court finds that the commissary exercised due care concerning the safety of

8

its patrons. It had a meaningful procedure concerning the doors: the stationing of a permanent employee within 30 feet of the doors with a clear view and instructions to keep the emergency exits closed, together with the frequent checks by other employees of the commissary, represented a reasonable mechanism to provide for patrons' safety. Finally, the length of time in which the door was actually open – in the area of two minutes or less – serves to buttress these findings.

Thus, the Court finds that plaintiff has failed to establish notice of a hazardous condition or absence of reasonable care.

### *Conclusion*

Plaintiff has failed to prove causation and failed to prove that the Government had constructive notice of a hazardous condition. Accordingly, the Court enters judgment in favor of the Government.

**SO ORDERED.**

Dated: Central Islip, New York
February 7, 2025

/s/ Gary R. Brown
Gary R. Brown
United States District Judge